# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

ANNETTE R. WAYNE,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

      Defendant.

**No. 05-CV-4115**

**ORDER**

———————————————

This case involves an application for disability benefits (SSD) under Title II of the Act, 42 U.S.C. §401 <u>et seq.</u> and an application for supplemental security income benefits (SSI) based on disability under Title XVI of the Act, 42 U.S.C. §§1381 <u>et seq.</u> Plaintiff, Annette Wayne, (hereinafter "Wayne"), filed this action requesting reversal of the Commissioner's decision that she is not disabled. After careful consideration of the parties' written and oral arguments, the Court reverses the decision of the Administrative Law Judge (hereinafter "ALJ") and awards benefits as of July 3, 2002.

## I. INTRODUCTION

Annette Wayne ("Wayne") applied for disability benefits ("SSD") under Title II of the Act, 42 U.S.C. §401 <u>et seq.</u> and

supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§1381 et seq. Tr. 104-06, 716-19. Wayne's alleged disability onset date is November 5, 2001. Tr. 104-06.

Wayne's application was denied initially and on reconsideration. Tr. 89-92, 96-100. A hearing was held before an ALJ on August 12, 2004. The ALJ determined that Wayne was not "disabled" within the meaning of the Social Security Act. Tr. 36. The Appeals Council denied request for review, therefore, the ALJ's decision stands as the final decision of the Commissioner.

## II. BACKGROUND

Wayne was thirty-four (34) years old at the time of the administrative hearing. Wayne has a twelfth grade education and has worked as a dietary aide, sales attendant and grocery store clerk. Wayne alleges disability due to Systemic Lupus Erythematosus[1] ("SLE"). Tr. 118. Wayne also has a history of

---

[1] "[A] chronic, remitting, relapsing, inflammatory...disorder of connective tissue...characterized principally by involvement of the skin, joints, kidneys and serosal membranes...[T]hought to represent a failure of regulatory mechanisms of the autoimmune system, as suggested by the high level of numerous autoantibodies against nuclear
(continued...)

asthma, headaches, diagnoses of fibromyalgia, fatigue and depression.

On May 29, 2001, Dr. David White, Wayne's local doctor, referred Wayne to Dr. Kevin Moder, a rheumatologist at the Mayo Clinic, for evaluation of possible evolving lupus. Dr. Moder agreed with Dr. White's diagnosis that based on Wayne's "joint symptoms together with her laboratory test abnormalities including a high titer positive ANA, apparently a positive double-stranded DNA, and a positive SM antibody would be most suggestive of systemic lupus erythematosus." Tr. 260. Initially Dr. White placed Wayne on Plaquenil[2], and Dr. Moder agreed that this would be the appropriate medication. Id.

In July of 2002, Dr. Moder recommended a "stronger agent" for Wayne's inflammatory arthritis because the Plaquenil did

_____

[1](...continued)
and cytoplasmic cellular components..." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1072 (30th ed. 2003).

[2] "[T]rademark for preparation of hydroxychloroquine sulfate", which is an antiinflammatory used in the suppression of lupus erythematosus. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1446, 874 (30th ed. 2003).

not seem to be controlling the symptoms.  Tr. 422.  By August of 2002, Dr. Moder indicated that Wayne's lupus was active and recommended that Wayne participate in a CellCept[3] study to control her lupus.  Tr. 418.

In July of 2002, Wayne's local primary care physician that had an ongoing relationship with Wayne regarding generalized ailments, Dr. Michael Ulrich, filled out a form that Wayne brought with her from Department of Human Services. Tr. 283.  Dr. Ulrich indicated that Wayne "does appear to have systemic lupus erythematosus with fatigue.  I do think that she needs permanent physical or mental limitations, which consists of low stress and sedentary duties.  She can perform a limited employment consisting of sedentary duties with half days."  Id.

In August of 2002, Dr. Ulrich indicated that Wayne would be able to perform limited employment consisting of sedentary work with half days, but would have difficulties with half

---

[3]    "[T]rademark for preparation of mycophenolate mofetil", which is an immunosuppressive agent, i.e., suppresses the immune response, that is used in conjunction with cyclosporine (an immunosuppressive drug) and cortisteroids (a steroid hormone).  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 328, 1207 (30th ed. 2003).

days due to frequent trips to the Mayo Clinic. Tr. 280.

In November of 2002, Dr. Moder noted that the CellCept did not appear to be providing any benefit after months of being on it. Tr. 388. Dr. Moder started Wayne on methotrexate[4] at 10 mgs. one day per week. Id.

By January of 2003, Wayne still complained of joint stiffness and pain. Tr. 381. Dr. Moder recommended increasing the methotrexate to 12.5 mgs. Id. By March of 2003, Dr. Moder increased Wayne's methotrexate dosage to 15 mgs. Tr. 570. By April, Wayne indicated that the methotrexate caused her nausea and quit taking the medication. Tr. 560. In June of 2003, Dr. Shreyasee Amin recommended a subcutaneous injection of methotrexate to decrease the nausea. Tr. 555. Wayne began taking methotrexate by injection in late June of 2003. Tr. 552.

In February of 2003, a consultative exam was conducted by Dr. Rosemary Linderman. Tr. 486-91. Wayne told Dr. Linderman that recently she had "a lot of joint swelling in [her] fingers and right knee and swelling in [her] toes [and] every

---

[4] Used as an antiarthritic. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1145 (30th ed. 2003).

joint in [her] body has pain, [she's] tired all the time. [She] can't go on unless [she] sleeps two to three hours a day..." Tr. 486-87. Ms. Linderman diagnosed Wayne with systemic lupus and assessed her a Global Assessment of Functioning ("GAF")[5] score of 50[6].

In March of 2003, Wayne had a limited rheumatology exam performed at the Mayo clinic. Tr. 568. It was determined that Wayne had fibromyalgia[7] with tender points at 12 of 14

---

[5] GAF score is used by psychologists and psychiatrists to measure a person's functioning at the time of the session.

[6] A GAF score of 50 indicates "serious symptoms" and "[a]ny serious impairment in social, occupational, or school functioning."

[7] Fibromyalgia is a chronic condition recognized by the American College of Rheumatology (ACR). It is inflammation of the fibrous and connective tissue, causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue. Diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests. According to the ACR's 1990 standards, fibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points or tender points. (This Court is unaware why the Mayo clinic only tested 14 sites, but that does not matter since 12 of the 14 sites were indicative of fibromyalgia.) Treatments for fibromyalgia include cold and heat applications, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories. See Jeffrey Larson, Fibromyalgia, in 2 The Gale Encyclopedia of Medicine 1326-27 (Jacqueline L. Longe
(continued...)

possible sites.  This noted medical center does not come to such conclusions lightly.  Fibromyalgia is a mean ailment.  There is no doubt, in this Court's mind, that Wayne has fibromyalgia.

In June of 2003, Wayne was referred to Dr. Margaret Moutvic and Dr. George Johnson by Dr. Amin.  Tr. 545-48.  Dr. Moutvic noted that "there is evidence of significant inflammation diffusely in her hands and wrists even though there is not a whole lot of focalized synovitis[8] that is identifiable.  Tr. 545.

By 2004, Wayne moved to Iowa and began seeing Dr. Robert Wisco.  Tr. 643-52.  In March of 2004, Dr. Wisco increased Wayne's methotrexate to 17.5 mgs.  Tr. 645.  In May of 2004, Dr. Wisco noted that there has been a lot of improvement in Wayne's conditions since the increased dosage.  Tr. 643.

---

[7](...continued)
et al. eds., 2d Ed. 2002).

[8]   Inflammation of the synovium, which is relating to joints in the body enclosed in a thick membrane containing a lubricating fluid.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1839 (30th ed. 2003).

## III.    ADMINISTRATIVE LAW HEARING

Wayne testified that her problems began because she started feeling fatigued, had trouble waking up in the mornings, and had significant joint pains.  Tr. 60.  Wayne stated that she ended up leaving her job because she would work for a couple of days, then would have to take the rest of the week off because of pain and tiredness.  Id.

Wayne stated that about once a month she would have a "flare up" where should would be in extreme pain.  Id.  She also indicated that these "flare ups" would last anywhere from one to two weeks.  Tr. 61.  During these "flare ups", Wayne stated that her friend, Nancy Peterson, who Wayne resides with, would take care of Wayne's children.  Id.

On a typical day, Wayne stated that she wakes up between 9 and 11 a.m., takes her medication and gives her son his medication; some days she'll play cards; takes a daily nap that lasts between two and three hours; watches television; takes more medication; and goes to bed.  Tr. 61-62.  Wayne stated that she rarely does household chores; Nancy Peterson and her children do the chores in the house.  Tr. 63.

Wayne testified that she does not believe that there are

any jobs that she could perform because she cannot stand on her feet for a long time, she gets really tired and has trouble staying awake. Tr. 67.

Wayne stated that she believes she could lift 5 pounds frequently and 10 pounds occasionally, but 10 pounds start to hurt her hands. Tr. 75. Wayne testified that she could stand about a half hour at a time and then needed to rest about a half hour, but could not stand for half the time in an eight hour day. Tr. 76. Wayne was unsure that she could stand for two hours in an eight hour day. Id.

Next, Nancy Peterson testified that she knew Wayne before she had lupus and that the two of them used to do whatever they wanted to. Tr. 78. Now, Peterson stated that she "pretty much take[s] the load in taking care of the kids and doing all the work and just trying to help [Wayne] get through the day." Id. Peterson also stated that during one of Wayne's flare ups, Wayne would either be in bed or on a couch for two weeks at a time. Id. Peterson indicated that Wayne has trouble doing pretty much anything. Tr. 79.

Next, the vocational expert ("VE"), Marian Jacobs, testified. Tr. 79. The ALJ's first hypothetical question

posed to the VE asked if the following individual can perform her past relevant work that has a residual functional capacity of:

> [F]requent lifting of 5 pounds, occasional of 10 pounds, only occasional gross manipulation, that's handling, able to do more than simple routine repetitive work, but not complex, so we'll have the semiskilled. No production rate pace, and only occasional interaction with coworkers.

Tr. 81.

The VE indicated that this individual would not be able to perform her past relevant work, either how she performed her work or how the work is performed in the national economy. Id. However, the VE concluded that there are some other jobs that this individual could perform, which were call out operator and as a sitter. Tr. 81-82.

The second hypothetical question posed to the VE stated:

> [F]requent lifting 5 [pounds], occasionally 10 pounds, standing one half hour at a time, sitting one hour at a time, occasional handling, occasional cold and humidity, simple routine repetitive work only, and by repetitive, I mean constant tasks. No production rate pace, occasional contact with coworkers. With those restrictions, would there be jobs that could be performed by an individual assuming the same age, education, and work experience as the Claimant?

10

Tr. 82-83. The VE testified that the job of a sitter would still be viable for this individual. Id.

Finally, the third hypothetical added the limitation of not being able to sustain an eight hour work day, which the VE concluded that there would be no jobs available. Id. The ALJ also added that in the first two hypothetical questions, they were supposed to have the limitation of being able to stand and sit for six hours in an eight hour workday. Id. The VE testified that since no limitation was placed on the sitting and standing, the six hours each were assumed and her answers would not have changed. Id.

## IV. ALJ'S DECISION

The ALJ concluded that Wayne has not engaged in substantial gainful activity since at least November 5, 2001, which is her alleged disability onset date. Tr. 35. Next the ALJ determined that Wayne had the following "severe" impairments, systemic lupus erythematosus, fibromyalgia, and depression. Id. But, the ALJ concluded that these impairments or a combination of these impairments did not meet or equal the level of severity required under the social security listings. Id.

Next, the ALJ concluded that Wayne's allegations regarding her limitations were not "totally" credible. Id. The ALJ did not make a determination on the credibility of the third party witness, Nancy Peterson, who testified at the hearing. The ALJ concluded that Wayne could not perform her past relevant work. The ALJ concluded that based on the claimant's age, which is considered a "younger" individual, education, previous work experience, and residual functional capacity that there were significant jobs in the national economy that Wayne could perform. Id. Based on the foregoing, the ALJ concluded that Wayne was not disabled.

## V.    DISCUSSION

This Court must determine whether the Commissioner's decision to deny disability benefits is "supported by substantial evidence on the record as a whole." Lorenzen v. Chater, 71 F.3d 316, 318 (8th Cir. 1995).

### A.    THE COURT'S JURISDICTIONAL BASIS

In Bowen v. Yuckert, 482 U.S. 137 (1987), the United States Supreme Court delineated the steps which precede a district court's review of a Social Security appeal:

The initial disability determination is
made by a state agency acting under the
authority and supervision of the Secretary.
42 U.S.C. § 421(a), 1383b(a); 20 C.F.R. §§
404.1503, 416.903 (1986).  If the state
agency denies the disability claim, the
claimant may pursue a three-stage
administrative review process.  First, the
determination is reconsidered de novo by
the state agency.  20 C.F.R. §§ 404.909(a),
416.1409(a).  Second, the claimant is
entitled to a hearing before an
administrative law judge (ALJ) within the
Bureau of Hearings and Appeals of the Social Security Administration.  42 U.S.C.
§§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III);
20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq.
(1986).  Third, the claimant may seek review by the
Appeals Council.  20 C.F.R. §§ 404.967 et seq.,
416.1467 et seq. (1986).  Once the claimant has
exhausted these administrative remedies, he may seek
review in federal district court.  42 U.S.C.
§405(g).

Yuckert, 482 U.S. 137, 142, 107 S. Ct. 2287, 2291 96 L. Ed. 2d

119 (1987).

Section 1383(c)(3) of Title 42 of the United States Code

provides, "The final determination of the Secretary after a

hearing . . . shall be subject to judicial review as provided

in section 405(g) of this title. . . ."  In pertinent part, 42

U.S.C. § 405(g) provides:

Any individual, after any final decision of
the Commissioner of Social Security made
after a hearing to which he was a party,
irrespective of the amount in controversy,
may obtain a review of such decision by a

13

> civil action . . .brought in the district
> court of the United States for the judicial
> district in which the plaintiff resides...
> The court shall have power to enter, upon
> the pleadings and transcript of the record,
> a judgment affirming, modifying, or
> reversing the decision of the Commissioner
> of Social Security, with or without
> remanding the cause for a rehearing. The
> findings of the Commissioner of Social
> Security as to any fact, if supported by
> substantial evidence, shall be conclusive
> . . . . The judgment of the court shall be
> final except that it shall be subject to
> review in the same manner as a judgment in
> other civil actions . . . .

Accordingly, this Court may affirm, reverse or remand the ALJ's decision.

**B.    THE SUBSTANTIAL EVIDENCE STANDARD**

The Eighth Circuit has made clear its standard of review in Social Security cases. If supported by substantial evidence in the record as a whole, the Secretary's findings are conclusive and must be affirmed. <u>Grissom v. Barnhart</u>, 416 F.3d 834, 837 (8th Cir. 2005); <u>Smith v. Shalala</u>, 31 F.3d 715, 717 (8th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); 42 U.S.C. § 405(g) (Supp. 1995)). "Substantial evidence 'is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" <u>Maresh v. Barnhart</u>,

14

438 F.3d 897, 898 (8th Cir. 2006) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).  In the words of the Supreme Court, substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citing <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

The Eighth Circuit has taken pains to emphasize that, "[a] notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  <u>Wilson v. Sullivan</u>, 886 F.2d 172, 175 (8th Cir. 1989) (quoting <u>Jackson v. Bowen</u>, 873 F.2d 1111, 1113 (8th Cir. 1989)).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis.  In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

<u>Id</u>.

The Court, however, does "'not re-weigh the evidence or

review the factual record de novo.'" <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996) (quoting <u>Naber v. Shalala</u>, 22 F.3d 186, 188 (8th Cir. 1994)).  Likewise, it is not this Court's task to review the evidence and make an independent decision. <u>Ostronski v. Chater</u>, 94 F.3d 413, 416 (8th Cir. 1996) (citing <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996)).  "If, after review, [it is] possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [this Court] must affirm the denial of benefits." <u>Id</u>.  Even in the case where this Court "might have decided the case differently", this Court cannot reverse if there is substantial evidence to support the Commissioner's decision. <u>Fredrickson v. Barnhart</u>, 359 F.3d 972, 976 (8th Cir. 2004) (citing <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002)).

The process, however, is not stacked in the Commissioner's favor because, "[t]he standard requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner]'s action." <u>Cooper v. Secretary</u>, 919 F.2d 1317, 1320 (8th Cir. 1990) (citing <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989)).  In cases where the Commissioner's

16

position is not supported by substantial evidence in the record as a whole, the Court must reverse.  <u>See</u> <u>Lannie v. Shalala</u>, 51 F.3d 160, 164 (8th Cir. 1995).  "'[T]he goals of the Secretary and the advocates should be the same:  that deserving claimants who apply for benefits receive justice.'"  <u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir. 1994) (quoting <u>Sears v. Bowen</u>, 840 F.2d 394, 402 (7th Cir. 1988)).

## C.  DETERMINATION OF DISABILITY

Social Security disability benefits may be awarded to disabled individuals who meet certain income and resource guidelines.  42 U.S.C.A. § 423 (d)(1)(A).  In connection with the award of such benefits to an adult:

> [A]n individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C.A. § 423 (d)(1)(A).

An impairment will only be considered of such severity if the individual is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity which

17

exists in the national economy. . . ." 42 U.S.C.A. § 423 (d)(2)(A).

Determination of a claimant's disability involves a five step analysis. 20 C.F.R. § 404.1520 (a-f). In the first step, the ALJ determines if the claimant had engaged in past substantial gainful activity. Next, the ALJ decides if the claimant has an impairment. Third, the ALJ must look at the regulations to determine if the impairment meets or is medically or functionally equal to a Listing in Appendix 1, Subpart P of Regulation No. 4. Fourth, the ALJ assesses the claimant's residual functional capacity (RFC), to see if the claimant could perform his past relevant work. At the fifth and final step of the analysis, the Social Security Commission must prove that there are a significant number of jobs (other than his past relevant work) in the national economy that a person of the same age, education, past work experience, and physical and mental residual functional capacity can perform. 20 C.F.R. § 404.1520 (f).

To acquire Social Security disability benefits, initially the claimant has the burden of showing 'that [he] is unable to perform [his] past relevant work.'" <u>Haley v. Massanari</u>, 258

F.3d 742, 747 (8th Cir. 2001) (quoting Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998)). This encompasses the first four steps of the analysis. "If the claimant carries [her] burden, 'the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and with vocational factors such as age, education, and work experience.'" Id. There must be some medical evidence to support the ALJ's determination of the claimant's residual functional capacity, and this evidence should address the claimant's ability to function in the workplace. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

**D. REVIEW OF THE ALJ'S DECISION**

"Deference to the ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence." Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). By that same token, the ALJ's credibility determination should not just be stated as a

conclusion in the guise of findings, but should be closely and affirmatively linked to substantial evidence. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Additionally, the law in the Eighth Circuit is well settled that an ALJ may not discredit a claimant's subjective complaints of pain, discomfort, or other disabling limitations simply because there is a *lack of objective evidence*. See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (noting that the ALJ may not discredit a claimant solely because the objective medical evidence does not fully support the claimant's subjective complaints of pain). Instead, the ALJ may only discredit the subjective complaints if they are inconsistent with the record as a whole. See Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); see also Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Under Polaski, the ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to: 1) the claimant's daily activities;

2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. Polaski, 739 F.2d at 1322. When the ALJ considers all of the Polaski factors and still makes a determination to reject a claimant's subjective complaints, the ALJ must give "good reasons" for discrediting the claimant's testimony. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). If an ALJ discredits a claimant's testimony and gives good reasons for doing so, the ALJ's decision should normally receive deferential treatment. Id. (quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).

In this case, it is undisputed that Wayne carried her burden of proving that she is unable to perform her past relevant work. However, the dispute here is over whether or not the Commissioner carried her burden of proving that Wayne retains the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with Wayne's impairments and with vocational factors such as age, education, and work experience.

First, the ALJ concluded that Wayne's subjective allegations of disabling pain were not "totally credible." Tr. 35. Secondly, the ALJ does not make a credibility finding with regards to Wayne's friend and roommate, Nancy Peterson. The Commissioner argues that the ALJ's failure to make an express credibility finding with regard to a third party witness is "harmless error."

With respect to Wayne's credibility, the ALJ concluded that Wayne is credible to the extent she says she has secondary symptoms stemming from lupus and fibromaylgia, which include fatigue and pain. Tr. 32. But, the AlJ concluded that Wayne's daily activities are inconsistent with her subjective allegations of physical and mental limitations. Id. For example, because Wayne participates in leisure activities, such as playing cards, watching television, and using the internet, that her allegation that she can only sit for one hour during an eight hour workday makes Wayne not credible. Tr. 32.

The Eighth Circuit has "consistently held that 'the ability to do activities such as light housework and visiting friends provides little or no support for the finding that a

claimant can perform full-time competitive work.'" <u>Baker v.</u>
<u>Barnhart</u>, 2006 WL 1596724, *13 (8th Cir. 2006)(citing <u>Hogg v.</u>
<u>Shalala</u>, 45 F.3d 276, 278 (8th Cir. 1995). This Court is
persuaded that because Wayne watches television or plays cards
does not indicate that she can sit for over an hour at a time
in the competitive environment of the workplace. It
definitely does not indicate that she has no restrictions on
sitting.

Wayne testified that she is unsure how long she could sit
for an eight hour day because she uses a recliner couch for
most of the time at her residence. Tr. 76. Wayne also stated
that she has "only sat straight up for about an hour." Tr.
77. The ALJ incorrectly concludes that because Wayne can
watch movies and televisions in a recliner couch, that her
allegation that she could only sit straight up for about an
hour is not credible. As previously mentioned, the fact that
Wayne said that she plays cards or uses the internet
occasionally does not warrant a finding by the ALJ that Wayne
is not credible in saying she can only sit straight up for an
hour.

The ALJ also concludes that the evidence of record does

23

not support this allegation by Wayne.  Tr. 32.  Lupus is "a
chronic, remitting, relapsing, inflammatory, and often febrile
multisystemic[9] disorder of connective tissue."  <u>Kelly v.
Callahan</u>, 133 F.3d 583, 585 n. 1 (8th Cir. 1998).  "In other
words, the symptoms of systemic lupus, such as pain and
swelling, can flare-up, subside, and flare-up again.  <u>Bowman
v. Barnhart</u>, 310 F.3d 1080, 1084 (8th Cir. 2002).  It is not
disputed that at times, Wayne's pain subsides and she is able
to do some simple activities.  However, more frequently than
not, Wayne's pain precludes her from doing most activities.

The "evidence of record" is full of acts by Wayne to
support Wayne's functional limitations.  Wayne was constantly
going to her local doctor, a rheumatologist, or a physical
therapist to alleviate her pain.  Wayne also tried several
different medications to control her pain.[10]  Dr. Ulrich
prescribed Wayne prednisone for "extreme pain", which further
supports Wayne's allegations of pain.  Tr. 206.  <u>See also</u>

---

[9]  Of or relating to or characterized by fever, affecting
many organ systems of the body.

[10]  On May 4, 2001, Dr. White started Wayne on 200 mg.
twice daily of Plaquenil; on May 23, 2001, Dr. White also had
Wayne taking 200 mg. daily of Celebrex due to her recent
diagnoses of SLE.

<u>Bowman v. Barnhart</u>, 310 F.3d 1080, 1083 (8th Cir. 2002). The evidence of record is consistent with Wayne's allegations of disabling pain, including her allegation that she could only sit straight up for one hour at a time.

Ms. Peterson testified that she has been living with Wayne for over a year. Tr. 32. Ms. Peterson testified that she pretty much has to do all of the housework because Wayne is unable to. Tr. 78. Ms. Peterson also stated that she has witnessed Wayne's "flare-ups" and testified that these occur maybe once or twice a month and last about two weeks. <u>Id</u>.

The ALJ noted Nancy Peterson's comments with regards to Wayne's limitations, however, the ALJ failed to discuss the weight he assessed to Ms. Peterson's testimony. The defendant argues that "[a]lthough specific delineations of credibility findings are *preferable*, an ALJ's arguable deficiency in opinion-writing technique does not require us to set aside a finding that is supported by *substantial evidence*." <u>Carlson v. Chater</u>, 74 F.3d 869, 871 (8th Cir. 1996) (emphasis added) (quotations omitted). However, this Court is persuaded that the ALJ's conclusions are not supported by substantial evidence.

The ALJ discredited some of the opinions of Dr. Ulrich and Dr. Robison because the ALJ seemed to think that the opinions were given only because Wayne asked for the opinions so she could present a claim for disability. Tr. 33. In light of that, the ALJ stated that he was giving "more weight to the clinical findings as well as the opinions of the other treating sources of record." Id.

On August 20, 2002, Dr. Ulrich concluded that Wayne will *not* be able to perform any employment in the foreseeable future. Tr. 274. Dr. Ulrich opined that Wayne currently has the following permanent physical or mental limitations: "low stress, sedentary duties; primarily sitting; stretch or rest every hour, stand or walk as tolerated; and no bending or lifting." Id. Dr. Ulrich concluded that Wayne could perform limited employment consisting of the above mentioned limitations for half days, but Wayne requires frequent trips to the Mayo Clinic and would even have difficulties with half days. Tr. 280.

In Dr. Ulrich's written report, he indicated that he filled out a form that Wayne brought with her from the Department of Human Services. However, there is no indication

that Dr. Ulrich altered his assessments simply because Wayne was applying for disability. For an ALJ to speculate that there is some sort of motive for Dr. Ulrich to exaggerate Wayne's condition in order to achieve disability is something that this Court cannot readily buy based on the record. See Tr. 33 ("[B]oth primary care physicians were extending opinions in an effort to assist the claimant in obtaining assistance and therefore, the [ALJ] has given more weight to the clinical findings as well as the opinions of the other treating sources of record.)

Wayne's current treating physician, Dr. Bryce Robison, indicated in February of 2004, that he has been seeing Wayne for approximately 5 months. Dr. Robison concluded that because Wayne is on "very high risk medications" and has "a number of significant health problems" that she would be difficult to be employed. Tr. 624. Again, this Court is persuaded that it is not ready to conclude that these doctors came up with these limitations simply because Wayne requested their opinion with regard to her limitations for her to present her case.

"A treating physician's opinion is generally entitled to

substantial weight, although it is not conclusive and must be supported by medically acceptable, clinical or diagnostic data." <u>Kelly v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998). A "specialist's" opinion about areas related to their specialty is entitled to more weight than a non-specialist. <u>Id</u>. A consulting physician's opinion that examines a claimant once or not at all, generally does not constitute substantial evidence.  <u>Id</u>.

Wayne's treating physicians' diagnoses are wholly supported by diagnostic and clinical data.  Lupus can be detected by a physical exam and a blood test that reveals antibodies that are found in almost all people with lupus. Wayne had several blood tests done that indicate a high level of these antibodies that are indicative of lupus.  Dr. Moder at the Mayo Clinic confirmed Wayne's treating physician at the time, Dr. White's diagnosis of lupus based on "joint symptoms together with her laboratory test abnormalities including a high titer positive ANA, apparently a positive double-stranded DNA, and a positive SM antibody..." Tr. 260.  Dr. Moutvic has indicated that "there is evidence of significant inflammation diffusely in her hands and wrists..."  Tr. 545.

This Court is persuaded that the opinions of Dr. Ulrich and Dr. Robison are not contradictory and are entitled to controlling weight. The medical record demonstrates that Wayne has a chronic and progressive disorder of lupus, which manifests itself through symptoms that disable Wayne, and that she also has fibromyalgia, as discussed on page 5 of this ruling.

Based on the foregoing, this Court concludes that the hypothetical questions used by the ALJ did not accurately depict Wayne's limitations; therefore, the vocational expert's answers to those questions do not constitute substantial evidence. "A vocational expert's testimony based upon an insufficient hypothetical question does not constitute substantial evidence." Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995).

First, the ALJ never includes Wayne's impairments in the hypothetical questions, only the limitations from these impairments. The ALJ simply asked the vocational expert if she has reviewed the record. Next, in the first two hypothetical questions, the ALJ does not impose the half-day limitation that Dr. Ulrich, her primary care physician,

assessed to Wayne.  In the third hypothetical question posed to the vocational expert, the inability to sustain an eight hour work day limitation was added.  The vocational expert opined that there was no competitive employment available. Tr. 83.

As mentioned, this Court is persuaded that the hypothetical questions were insufficient in that they did not include a lot of the limitations set forth by Wayne's treating physicians and the testimony of Wayne and Ms. Peterson.  For example, none of the hypothetical questions included the need to take a nap, take frequent trips to the Mayo Clinic, or account for "flare ups", which could prohibit work for up to two weeks at a time.

In this case, the burden shifted to the Commissioner to show that Wayne could perform competitive work day in and day out in the competitive conditions of the working world. Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) ("[T]he claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.").

This Court is persuaded that the Commissioner failed to

meet this burden.  In addition to omitting the need for naps and the "flare ups", the ALJ failed to give appropriate weight to Wayne's treating physicians' opinions, which were well supported by the medical evidence, improperly discredited Wayne's testimony regarding subjective complaints of pain and fatigue, and failed to make a credibility determination regarding Nancy Peterson's testimony concerning her observations of Wayne's limitations.

## IV.  CONCLUSION

The Court has carefully considered the arguments of the parties and closely examined the record and is persuaded that there is not substantial evidence in the record as a whole to support the decision made by the ALJ.  This Court is persuaded that the ALJ erred in discrediting the testimony of the plaintiff, failing to comment on Nancy Peterson's testimony, and did not accept the treating physicians' opinions as controlling.  Furthermore, the ALJ's hypothetical question did not accurately depict Wayne's impairments and limitations, as set out above.

The record convincingly establishes that Wayne is disabled.  Remanding this case for further proceedings would

only delay Wayne's receipt of disability benefits (SSD) and supplemental security income benefits (SSI); therefore, "an immediate order granting benefits without remand is appropriate." <u>Cline v. Sullivan</u>, 939 F.2d 560, 569 (8th Cir. 1991); <u>Tennant v. Schweiker</u>, 682 F.2d 707, 710 (8th Cir. 1982). Wayne clearly suffers from Systemic Lupus Erythematosus ("SLE"), fibromyalgia, and depression. These conditions significantly impair her ability to function in the workplace.

Judgment shall be entered reversing the ALJ's decision of denying such benefits and awarding benefits as of July 3, 2002, this is the date that Dr. Ulrich opined that Wayne could perform limited employment consisting of low stress, sedentary duties of only half days. Tr. 283

**Upon the foregoing,**

**IT IS HEREBY ORDERED** that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to Wayne with an onset date of July 3, 2002.

A timely application for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 ("EAJA"), must be filed within thirty days of the entry of final judgment in this action. Thus, if this decision is not appealed, and Wayne's attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment based on the Order in this case.

**IT IS SO ORDERED** this 21st day of September, 2006.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa